We have four cases on the calendar this morning. A patent case from the District Court, a patent case from the PTO, a trade case from the Court of International Trade, and a government employee case which will be submitted under briefs and therefore not be argued. The first case is the patent case from the District Court, DataTern v. Blazin et al., 2013-12-51 and 52. Mr. Belt. Good morning, Your Honors. I'm Eric Belt of McCarter & English. I represent DataTern, and thank you for hearing us today. There's a single issue in this case, Your Honor. It is the claim construction of the term from Claim 1 of the 502 patent employing the map to create at least one interface object. Now, let me just tell you briefly how we got to this point so that you can better understand the background. As Judge Moore may recall, there were two cases, two sets of cases, one pending in the Southern District of New York, one pending in Boston. The New York court reached claim construction first. At that point in the Boston case, the parties disputed whether the New York court's claim construction would control until this court had a chance to rule on the terms. And the end result of that dispute was that DataTern conceded non-infringement of one term. If that term, employing the map to create at least one interface object, were held by this court to have been construed correctly by the New York court, then we conceded infringement. And that's why we're here on appeal today. So when I refer to the New York, when I refer to the district court, I'm referring to the New York court's claim construction in the Markman order, which is part of the record of this case. To set the stage for what the court did here, it may help to have a, also a very brief explanation of the technology. In the Markman order, the district... Why don't you focus on what the patent says? Okay, thank you. Because there's a lot in there that's what you're really dealing with. All right. So that's what I was getting to next, Your Honor. And really, it's what the patent says, of course, that controls. And we're going to start with the claims. The claim says, employing the map to create at least one interface object. The district court wrote into that phrase that the term create means to generate code for at least one class and instantiate an object from that class. It's not in the claim. There's nothing in the specification that requires that phrase to be written into the claim. Doesn't the specification say a code generator is employed to examine the relationships defined in the map 12, etc.? Doesn't the specification tell you what the claim means? The specification tells you a preferred embodiment of the claim, one embodiment. Is there another one? Yes, there is, Your Honor. So, I'll take you through two figures. In one figure, figure one, Your Honor, in figure one, you have one way to generate an interface object through a code generator. Now, that's claim 10. Claim 10 specifically calls out the use of the code generator. Claim one does not. In figure one, there's a second route. And the district court recognized that. I believe it's on page A118 of the record. You mean the double arrows? The arrows between, from the map to the runtime engine to the interface object. And it's the runtime engine that's talking to the map and creating the interface objects. And we know that because when you go now to figure seven, Your Honor, figure seven shows, first of all, it's described in the text of the specification starting at column six around line 31. Figure seven illustrates, I'm quoting, figure seven illustrates the sequence of actions that take place when a business object creates, there's that word, creates a DSL object in step 61. DSL object, I think both parties agree, is the interface object. And so, figure seven is talking about the dynamic process of creation. And that, if you look at the claim wording, But isn't that utilizing a runtime engine? Figure seven is a diagram that illustrates operation of the runtime engine. And isn't that after the operation of the code generator? It could be, Your Honor, but the claim one doesn't specify when or if a, what happens with the class from which a interface object is instantiated. Is your argument that claim one simply requires instantiating an object, and that that can be done by the runtime engine itself, that it doesn't have to be done separately, that the runtime engine could actually cause that to occur? That's what I believe figure seven is showing, Your Honor. With the caveat that, And so, your claim one, the third element says, utilizing a runtime engine which invokes at least one interface object, you would say, okay, there, the runtime engine has to do it, but the employing the map to create at least one interface object can be done by a code generator which creates a class and then instantiates an object, or, and that would fall within this claim, or alternatively, it could be done by the runtime engine pursuant to figure seven which instantiates a claim that instantiates an object. The claim one doesn't express the claim creating the class by code generation. That's the nuts of our argument, Your Honor, which is claim one, that step, employing the map to create at least one interface object is silent as to the method of creation. Creation in that sense is a generic term. I think the problem, though, just so you know, which probably causes us and possibly even district courts to get off track from the technology is that throughout your brief, you keep objecting to code generation, but that's not your actual objection. Your objection is class creation. Your objection is, we can use a preexisting class and then use the runtime engine, which, by the way, generates code, to instantiate the object. So your argument isn't that code generation can't be or is never employed or doesn't need to be employed. It seems to me that your argument is that this all is about the fact that the claim doesn't require or limit us to creating a class through the code generator, but rather allows for use of a preexisting class. But that isn't the way you argued it, and that's why I think that you might have partially ended up here is because throughout your brief, you keep flaming about code generation, but that's not your problem. Your problem isn't with code generation. Your problem is with class and creating it versus using preexisting. It seems to me the heart of what you would like changed about this construction. Am I right? Well, I think that's actually what we did argue, and I apologize if it did not come through as clearly. But the district court didn't decide on that basis, certainly. The district, the New York court, wrote into the term... And we're on appeal from the Massachusetts court. Right. Which relied on the district court. And you're talking now about figure seven and run time, and that wasn't decided by the New York court on which the Massachusetts court relied, right? No, that was decided by the New York court. We argued in the New York case that the claim was not limited to use of a code generator to generate code for a class. And during the process... Yes, but you didn't... The district court didn't decide on figure seven, didn't analyze the figure seven point. I don't know if the district court wrote that into the opinion. The district court relied on figure one. I think that would be a better way to say it. Did you make arguments to the district court in New York regarding figure seven creating an embodiment? I think we did, yes, your honor. You think? I'm pretty sure that we did, yes. It's not on the record, though. You're right, it is not on the record. It's in our joint appendix. Excuse me? Is it in our joint appendix? No, well, what is in the appendix is the Markman order. So what is of record, and that's actually a very good point, what is of record in the Boston case, your honor, is the Markman order, so you have that text, the patent, of course, and you also have the declaration of data terms expert, Niraj Gupta, who says in paragraph 20 on page, I think it's 1075, that you could create an interface object from the pre-existing class. He expressly references in that declaration figure seven and explains all that, right? Well, yes, I think that's true. In this case, does he in his declaration expressly reference figure seven? I will look. So in paragraph 20, he is citing to the description of figure seven starting at column six where it is described that O object is a pre-existing class from which that it can be generated from. But he's got that weird testimony that you no doubt don't enjoy from the New York case where someone asked him were there any embodiments that didn't use code generation. He's like, nope, not that I see, not in this patent. Well, what he actually said was as I'm sitting here today, I can't recall or I don't know what is in, I can't think of another one that's in there at that time. It's not a big patent. No, I know, your honor. How is it so clear to us that figure seven is predicated on a pre-existing class rather than a generated class? Let me take you through it. I'm looking at column, the bottom of column five through column six and the DLLs are generated. So if you look at... And then the D person in the middle of, well, I guess at line 35 of column six, we see that D person parentheses the generated column implementation class is invoked in step 62. That is, if you look at figure seven, your honor, that is pre-existing at the time that the creation takes place. See, the problem is... What does the word generated mean then to you? It could have been generated at any time before, but at the time, but what figure seven is showing is that that D person is constructed from O object, which is a class that exists in the runtime engine if you look back at figure six and figure five. And what that does is, don't forget the claim says... Figure five says generated DLLs, right? And one of the generated DLLs is the generated D person. But the claim doesn't require that, you're wrong. I know, but you're trying to convince us that what's going on here in figure seven is a interesting new separate and distinct embodiment from what was disclosed in figure one about code generation. Rather than column five and six really just being a further discussion of what's going on later in the claim about utilizing the runtime engine. So I'm trying to figure out, and I wish I knew more about this field, about why there are strong signals here in this very hard to read section of the patent that convinces me, that makes me feel comfortable in believing that yes, you are disclosing and you have contemplated a completely separate and distinct embodiment that is relying on pre-existing classes and it's not generating classes when I see the word generated here, here, here, and here. Okay, so let me... There are two answers to that question. Answer number one is if you go through, excuse me, if you go through figure seven you do not see anything here about code generation to generate a class. During the process of creation, the moment of creation, you are not generating a class. It's as if the classes and objects have been analogized to cookie cutters and cookies. If I say create a cookie that could be go to the machine shop, build a cookie cutter. Each time you want to stamp out a new cookie. Or it could be go to the kitchen junk drawer, get your pre-existing cookie cutter out and stamp as many cookies as you like. That's actually what's happening in figure seven. You have the pre-existing class OO object that is in the runtime engine that goes to the map at step 63 to get the attribute values and then imports that back to initialize the deperson interface object class. But there's a second answer. The second answer is... Is there an expert report I can read that says everything you just said to me? Well, we have paragraph 20 from Mr. Gupta's declaration which is the only evidence in this case of record. And I think... And the second answer to the question and I see that I'm running out of time is that the... It's not enough to say here's what it is. For the specification to be read into the claim, the specification has to say this is what it is not. And MicroStrategy has not pointed to any such clear disclaimer of scope. And I'll leave you with... Why isn't your argument based on the spec? I feel like you're running away from what I think are all your best arguments and I don't understand. Why don't you just answer Judge Chen by saying figure 7, as the spec says, illustrates the sequence of actions that take place when a business object quote creates an object. That's what I said. So why don't you just say to him figure 7 expressly says it's all about creation of the object which are the identical words in the claim. You know, you're just... You're running around in circles. I'm sorry, Ron. I'm trying to answer his question but that's how I started my argument which was that's what figure 7 shows. And figure 7... You can tell us that but wouldn't it help you if you instead pointed to the spec which says that's what figure 7 shows? I did. I read that actually, Your Honor. I read exactly that sentence and I apologize if it's not more clear. Figure 7 does show that. Figure 7 shows and it's described as what happens during creation of the interface object. That is the sequence of events. Figure 7. So you don't even have to go further than that. Mr. Belt, as you can see your time has expired but we'll give you your three minutes back and... I'm not staying for three months. This is one issue. I think it'll take less time. I hope you'll certainly be here in three months. Mr. Kessel, if you need... Good morning, Your Honors. May it please the Court. My name is Adam Kessel. With me is Sivananda Reddy. I represent the Apoly MicroStrategy. I'm also authorized to speak on behalf of the other co-Apoly defendants aside from Lancet and Magic Software whom I understand... Is it appropriate for us to go chasing around into other joint appendices from other appeals? Yes. I'm still new to my job here but this is very weird to me that it's not in our joint appendix. Now we're being put on some kind of paper chase to go dig through other joint appendices. Or maybe even have to go through the district court's record to figure out what you're saying. So, Your Honor, I'll address the appendix issue first and I'd like to return to Figure 7 and then, time permitting, I'd like to discuss what's the real point of this invention. But starting with the appendix question, the whole point of our stipulation in the district court was to save recreating a duplicate record in the Boston court. The only evidence we put in was non-infringement evidence and we moved for non-infringement under each of the different claim terms as they've been construed in New York. Data turn only stipulated on one and that's the one the judge went with. We didn't do a whole new claim construction process in Boston. But you also didn't move the admission into the record of all that evidence. So, it's not part of your record in this case. So, how can we choose an expert report filed in a different case that you never moved a simple Your Honor, in light of this, we move into can we move agree to move into the record all of this evidence? We're an appellate court. We can't go outside of a record. Your record in this case doesn't include most of what you rely on in your briefs. How the heck could we possibly rely on that? So, everything this court needs to affirm the Boston Court's claim construction adopting the New York Court's claim construction is a matter of public record. The provisional applications Wait, expert reports filed in another case are a matter of public record and we're going to rely on them in this case to create extrinsic evidence that helps inform our claim construction? We can go right to the provisional third proposition. Understood, Your Honor. The expert declaration we cited from the SAP appeal which was in the appendix in the appeal argument that happened about a year ago was explaining the intrinsic evidence but we can go right to the intrinsic evidence look right at the provisional that that expert was opining on without the benefit of the expert testimony if that's what this court would prefer to do. It's all in there. We cited to what was in the public appendix in the SAP case to provide context for what the intrinsic record was. Frankly, Your Honors, I was unable to find any procedural authority on this somewhat unusual situation where the two appeals were not consolidated they were fully briefed at the same time and then our appeal was stayed for about a year. I'd like to move on to the where we left off with Figure 7. So, Figure 7 is clearly not a separate embodiment of the invention. As Your Honor pointed out, all the discussion of Figure 7 says that the starting point of Figure 7 are the generated DLLs, the generated interface objects or the generated classes. There's no suggestion in the specification that you got to Figure 7 any way other than by generation and there's no suggestion in the record anywhere that generation means anything other than writing code. If you look at the patent as a whole, Figure 1, Figures 5 and 6 and 7 are all connected. They're not different inventions or different embodiments, they're all steps of the same process. You only get to Figure 7. Figure 7 doesn't show selecting an object model, it doesn't show getting the database schema, it doesn't show linking them together in a way that the map gets to code, it just shows what happens at the end, at the run time, which is the final limitation of Claim 1 and Claim 10. Now, another critically important thing about Figure 7, the claim requires creating an interface object, employing the map. Figure 7 does not show employing the map to create an interface object. What about when it says set initial values to default from the attribute info? In Figure 5 and 6 you can see that attribute info is a characteristic in the map. That's correct, Your Honor. So it's using the attribute info from the map. That's correct, Your Honor, and that was the argument. How is that not employing the map to create the object? That's correct, Your Honor, and that's the argument my brother raised in the reply brief. The reason that doesn't help them is the specification is clear that the creation being depicted in Figure 7 is Step 61. You go from 61 to 62. That is when an object is instantiated from a class. That step does not employ a map. The object is instantiated by the end of Step 61. There's nothing in the specification that suggests otherwise. Once you have this object, an object is a data structure. It's essentially looking to be populated with data. At that point, what the specification teaches is the runtime engine uses the map to get data from the database and put it into the object that has already been created. There's nothing in the specification that suggests that the creation step goes all the way to the right side of the database. Well, except that it says in the description, O object is constructed when the constructor of the D person, the generated com implementation class, is invoked in Step 62. That's correct. So isn't O object the interface object? So invoked is different than created. I just want to make sure I understand the technology. Isn't O object the interface object? It's the end of the process of creating an interface object. It's what's instantiated at the end of the district court's construction. Yes. It's the instantiated object. That's correct. Okay. So Step 62 is the instantiated object. And so I don't understand. The attribute is used to expressly I think I can help you, Your Honor. I don't understand. It's not part of the process according to me. I think I can help you. This description of Figure 7 is fairly dense. First sentence says object is created in Step 61. Meaning in Step 62 we have the object. Then it says the object is constructed when the constructor of the D person, the generated implementation class is invoked in Step 62. Invoking an object is not creating an object. And we know that because data turns stipulated to a construction of invoked which means to call. This is at A90 in our appendix. To call an object is different than to create an object. Calling is what you do once you have the object out there and you need to access the information in the object, put information in, take it out. The last step of Claim 1 also uses the word invoked. And that is the stipulated construction. It's not really at issue in this appeal, but it is in the record. Utilizing a runtime engine which invokes at least one interface object. So I guess that's what you mean by calling the interface object. That's what data turn means. That's how they stipulated in the Microsoft and SAP cases. They stipulated that invoked means called. And that's all consistent with all of the teachings of the Intrinsic Record. But I don't understand how that answers my question or clears things up for me because even if I extract the word invoke and stick the word call in there, it still says O object is constructed. The normal definition of constructed is created, right? You can't construct something that has already been created, correct? I mean, is there some other definition of the word constructed that you're familiar with? There is. I don't know that there's record support for it other than looking at how this O object is used throughout the specifications, throughout the two provisionals that are incorporated. How do you instantiate an object without having a class? D person is the only class referred to in Figure 7. There's no other class referred to. You can't instantiate an object, right, until you have the class, correct? That's precisely our point. Technically. So, how can the object be created prior to use of D person, which is articulated in that second sentence? O object is constructed when the constructor of the D person is invoked in Step 62. How can that be read any other way other than the object is created when you use the class that is D person and instantiate the object? I'm missing your point. Well, one point I think Your Honor made for me, which is how do you get an object without a class? You can't. So you can't create an object without having a class and there's no teaching in this patent of coming up with a generic implementation. It doesn't do anything. It needs the custom interface object that was created based on the mapping of the relational database to the object oriented program to actually be functional. Is that true for every object, right? You're not describing something unique about O object that sets it apart from every other embodiment. I am, Your Honor. The description of O object in the specification says that it is generic. I have this citation here somewhere. It would    talks about constructing O objects. And the description of O objects is that they are generic objects. They are generic objects. That's right. And then if you jump up one paragraph, column 6, line 8, it describes what O O base and O O object are. This is starting on line 9. O O base is a base abstract class, which is used as a base for all the generated implementation classes. This is kind of the empty shell with the... But O O base isn't what we're talking about. We're talking about O object. Well, and then that paragraph goes to describe that O O base contains a pointer to the O O object. These are the... The definition of O O object starts at line 24 of column 6 where it describes what's in O O object. These are generic attribute flags. These are not the results of the mapping. This isn't the thing that connects the database and the object-oriented program that previously had this object in O O. What about the fact that claim 10 expressly recites a code generator while claim 1, the method claim, does not? I have two responses. First, I think that helps us because it gives some color to what an interface object is. It's the sort of thing that a code generator  It's not usually here because there are many uses in the specification of an object to mean a class in the figures and in the specifications. So claim 10 gives some clarity to what sort of thing an interface object is. It's what gets spit out of the code generator.  what we're left with is two teams of lawyers talking at it without any sufficient expert support. So now we're left with a situation where the claim on its own terms is pretty broad. It doesn't explain how the object is being created other than the fact that it's employing a map. It doesn't talk about using a code generator even though the disclosed embodiment references a code generator. There's a lot of times where disclosed embodiment will itemize a series of elements but then the claim only recites some but not all of those elements and there's nothing inherently wrong with that. When we have a claim like that we don't start shoveling in every single element that's disclosed in the embodiment that isn't actually recited in the claim. We know that the patent owner knows how to recite code generator into a claim. It did it in claim 10 and it did not do it in claim 1. Well, Your Honor, I submit there we have an apparatus claim and a method claim. They seem to be reading on the same embodiment but let me get to the heart of your question. What do we do in this situation? Sure. The method claim does talk about employing a map. So that part from figure 1 has been brought into claim 1 but the embodiments are, we also look at what the patent says about what is the problem that solved, how does it solve it, what are the benefits of the invention. This is very similar  retractable technologies case, to the Microsoft multi-tech case several years back. And we look at the statements in the patent about what the benefits are at column 1, line 66. It recites, a benefit of the invention is neither programmers nor software applications need to have knowledge of the database structure to obtain access to the relational database. That can only be done by writing code. Well it can only be done according to the patent by having something called an interface object that bridges the gap between the database and the software. It doesn't say right there, thanks to our handy code generator that we've invented. Well let me get to, there's extensive evidence on this and much of it is in the provisional. Now the first provisional, it's about 90 pages, mentions code generation 60 times, any page that doesn't mention code generation is talking about a completely different aspect. The provisional says, the value proposition for this OI3, which is the new product, and the provisional goes on. It compares the new product to what they were calling the predecessor product. This is the September 26, 1997 provisional at 52. It distinguishes the predecessor product, which implemented mapping at run time. It says, OI3 avoids generic implementation. The generic mappings will be C++ code and then it lists all these negative features of doing it the old way, of doing it all at run time, execution time, complexity, maintenance issues, startup overhead, and then it says in the provisional, code generation addresses all the negative features listed above. This is a clear statement of what's being invented, what the benefit is, and it's throughout both of the provisionals, which are there in the specification, they're incorporated by reference, they keep referring to the code generation button, the benefits of code generation, how it saves the programmer time, how it can maintain the infrastructure without the programmer having to do the laborious work that was in the prior art. The object relational mismatch required the programmer to handwrite this code, and that's there right in the specification. We don't need to go to Dr. Hosking's declaration. We can see it in the specification that they had a predecessor product that didn't do code generation, the original filing, the second filing, the third filing, every reference to an interface object is a generated interface object. There's some different terminology in the provisionals, and we point to the... So if the claim is read as plainly and broadly as data term would have it, then would you have a validity ground? Absolutely. Absolutely we would, but we submit that because the provisional talks about the prior art as not doing code generation, and then talks about the benefits of code generation, and it matches every embodiment, it matches figures one, five, six, seven, every reference to these things, every reference to these interface objects is something that started with code generation. So... Mr. Kessel, we've given you extra time. Do you have a final summary sentence? Just, Your Honor, that this invention was all about code generation, and that's what the intrinsic record shows. Thank you. Thank you. Mr. Bales will give you three minutes. Thank you, Your Honor. What about all these references in the provisionals about touting the need for code generation? Right. Well, two things to say about that, Your Honor. First of all, that is not in this record, and as I think it may have been Judge Moore, maybe it was you, I don't recall, under Rule 28i, microstrategy and the defendants cannot bring into this record the pleadings and the... Okay, we got that argument, but on the merits. You have three minutes. And on the merits, that was not the basis. By the time that you get to the full utility application and the patent, that was not the basis for distinguishing the prior art. In fact, I can tell you that in the New York case, we did not rely on the September provisional. We relied on the December provisional for priority. And the patent says, at the brief summary of the invention, the mapping... The front page of your patent refers to both provisions. It does, but I'm telling you there was... Related U.S. application data. I can tell you that there was testimony by the inventor, one of the inventors, that there were further developments since, between September and December for the December provisional. The... Well, let me go to the merits, though. The merits of this issue from a technical standpoint, doesn't code have to be generated to instantiate an object? Everybody agrees they're fighting over whether code has to be generated to create a class. You're saying that's not part of the claim. They're saying it is. But doesn't code still have to be generated to instantiate an object? No, Your Honor. No? You can instantiate an object from a pre-existing class. No, you have to use code to do it. This is a software patent, for God's sake. I mean, how are you instantiating an object? You're bringing in a ball of clay and molding it? No, you've got to use code, right, to instantiate the object. Let me put it this way, Your Honor. The patent is not specific to any one kind of object-oriented software programming language. Yes, but they all employ code. It's not complicated. In the patent, which is referring to, I believe, C++, that is a way to do it. It's not the only way to do it. And the patent, the claim, is silent as to how it gets done. But wouldn't every way to do it employ code? Forget about whether code is needed to create a class. Isn't code a necessary component of instantiating an object? Creation of code to instantiate the object. I think we're talking about software coding in general, so a lot of things, you're right, there are a lot of things that are depending on that. The claim does not require that, and the claim does not say when that was just said, creating an interface object. Then it would be even broader. Right, and then would you say, oh, the claim doesn't require a map either? Yes, that claim does not require a map. If it does not recite it, it is not in the claim. The mapping feature of this invention seems to be awfully critical. That's what I was going to come to. That seems to be like the heavy spotlight is on the map. And that's what I wanted to get to when I was answering your first question. The patent says, in the brief summary of the invention, at column one, there are three interface objects that are utilized by an object-oriented software application to access the relational database. Now, the fact that the mapping is an important part of this claim... The title of the invention. The title of the patent. And that's why it's important for the application to help us define the invention as recent cases, which we have just issued, talk about language like present invention would be important, right? And at column one, line 53, this says, in accordance with the present invention, a mapping is employed. So you'd have a hard time running away from the map being a critical part of this invention, which would need to be something that would be employed, but there is no similar language anywhere in this spec about the present invention in terms of code generation of a class. That is correct, Your Honor. And that's why the mapping is recited in the claim, and it's shown in figure 7, the attribute, line, I think it's step 63, is getting the attribute, which if you  figure 6, shows that that step is part of the map. Now, maybe I could leave you with this, Your Honor. One of the cases that we cite is the Resonate case. But if you leave us with one further thought, that will be fine. Yeah, that's where I was going. The Resonate case that we cite in our reply brief, 338 F 1360 at page 1365 says, the district court's level of detail analysis does not withstand close scrutiny. The patentee's apparent choice not to specify a transmission path from the server to the client led the district court to add a limitation that the requested resource be transmitted directly to the client. But patentees are not required to claim each part of an invention with the same amount of detail. Indeed, such a rule likely would prove unworkable. Courts may not rewrite claims. Thank you, Mr. Belk. We know the law. And that's the basis of our argument. Thank you. We'll take the case under advisement.